[Cite as *State v. Brown*, 2018-Ohio-3068.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

STATE OF OHIO                                    :
                                                 :
    *Plaintiff-Appellee*                          :      Appellate Case No. 27738
                                                 :
v.                                               :      Trial Court Case No. 2017-CR-1677
                                                 :
ANTHONY J. BROWN                                 :      (Criminal Appeal from
                                                 :      Common Pleas Court)
    *Defendant-Appellant*                         :
                                                 :

     . . . . . . . . . .

O P I N I O N

Rendered on the 3rd day of August, 2018.

     . . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
     Attorney for Plaintiff-Appellee

CHARLES W. SLICER, III, Atty. Reg. No. 0059927, 426 Patterson Road, Dayton, Ohio 45419
     Attorney for Defendant-Appellant

     . . . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Defendant-appellant, Anthony J. Brown, appeals from his conviction in the Montgomery County Court of Common Pleas after a jury found him guilty of felonious assault, domestic violence, and kidnapping. In support of his appeal, Brown claims his felonious assault conviction was not supported by sufficient evidence and was against the manifest weight of the evidence. Brown also contends that the trial court erred in failing to instruct the jury on aggravated assault as an alternative to felonious assault. For the reasons outlined below, the judgment of the trial court will be affirmed.

### Facts and Course of Proceedings

{¶ 2} On June 8, 2017, the Montgomery County Grand Jury returned a two-count indictment charging Brown with felonious assault in violation of R.C. 2903.11(A)(1) and domestic violence in violation of R.C. 2919.25(A). Approximately two months later, on August 18, 2017, the State issued a re-indictment that added one count of kidnapping in violation of R.C. 2905.01(A)(2). The charges stemmed from a domestic dispute that occurred between Brown and his girlfriend, A.W.

{¶ 3} Brown pled not guilty to the indicted charges and the matter proceeded to a jury trial. A.W. and Brown both testified at trial and explained that they had become romantically involved in November 2016. Shortly after the couple met, Brown began living with A.W. at her residence in Huber Heights, Ohio. The couple dated for six months until they broke up over Mother's Day weekend in May of 2017. After the breakup, Brown left A.W.'s residence and went to live with his mother. Two weeks later, A.W. and Brown began communicating via text message and decided to meet over

Memorial Day weekend. This meeting resulted in Brown and A.W. rekindling their relationship, as Brown spent the night at A.W.'s residence on Saturday May 27, 2017.

**{¶ 4}** After spending Saturday night together, A.W. and Brown made plans to see each other on Sunday evening after Brown got off work. Once Brown was finished working, A.W. picked up Brown in her truck and drove him to her residence where they worked on a home improvement project, had dinner, and played cards. During that time, A.W. testified that things between her and Brown began to get tense. A.W. testified that Brown started to question her about a concert she attended with another man while she and Brown were broken up. A.W. testified that she and Brown got into a verbal argument when Brown accused her of having sex with the man from the concert. A.W. claimed that she denied Brown's accusation, but that Brown nevertheless called her a "cheating whore" and repeatedly asked if she and the man from the concert had sex. Tr. at 127.

**{¶ 5}** At that point in time, A.W. claimed that she was becoming concerned with Brown's behavior. A.W. testified that she attempted to call Brown's mother in an effort to calm him down. The State admitted a call log showing an attempted outgoing call from A.W.'s cell phone to Brown's mother at 9:57 p.m. *See* State's Exhibit No. 14. After attempting to call Brown's mother, A.W. testified that Brown got angry and continued asking her if she had sex with the man from the concert. During this time, A.W. testified that Brown "changed his face and his body language and got this crazy look in his eyes." Tr. at 127.

**{¶ 6}** Continuing, A.W. testified that she eventually admitted to having oral sex with the man from the concert, and that Brown "lost it" and "got physical." Tr. at 128. Specifically, A.W. testified that Brown pushed her and grabbed her cell phone, over which

they began to physically fight. Scared by the physical nature of the argument, A.W. testified that she attempted to run out the front door of her house. Upon doing so, A.W. testified that she fell down on her knees and hit her face on the concrete. A.W. testified that Brown then came outside after her, pulled her back inside the house by her arm, and locked the door. A.W. also testified that she screamed for help as Brown pulled her back inside the house.

{¶ 7} Once the pair was back inside A.W.'s house, A.W. testified that she ran into the master bathroom where she attempted to treat her wounds from falling. According to A.W., Brown followed her to the bathroom and smacked Band-Aids, peroxide, and cotton balls out of her hands. A.W. testified that Brown then started yelling vulgar things at her and once again called her a "cheating whore." Tr. at 128-129. A.W. testified that Brown then pushed her onto her bedroom floor and began to smash her face in the carpet to the extent that she had difficulty breathing.

{¶ 8} After Brown smashed her face in the carpet, A.W. testified that Brown made her get onto the bed and told her to "[j]ust lay here and be quiet." Tr. at 129. A.W. then claimed that Brown said he wanted to get out of the house and told her "[y]ou need to drive me home." *Id.* A.W., however, told Brown that she could not drive because she had been drinking, but offered to call him a cab instead. A.W. testified that Brown let her call a few cab companies from the living room, but that he threatened "[d]on't you be calling anybody for help. * * * If you make one wrong move, I'm going to snap your neck." *Id.*

{¶ 9} Although she called several cab companies, A.W. testified that she was unable to get a cab to pick up Brown because it was a holiday weekend. When she

could not get a cab, A.W. claimed that Brown grabbed her phone and her purse and began to fight with her again. During this fight, A.W. recalled Brown swinging her around by her purse, pushing her onto the living-room floor, and getting on top of her. A.W. testified that she flipped around in an attempt to defend herself and tried to push and kick Brown off her, but Brown was too strong.

{¶ 10} A.W. further testified that her arm began hurting sometime between fighting Brown in the bedroom and the living room. Upon noticing the pain in her arm, A.W. claimed that she told Brown her arm was hurt, and that Brown responded by saying he did not care. After she pled with Brown to let her go, A.W. recalled Brown saying: "You're not leaving this house alive tonight. * * * I'm going to kill you." Tr. at 135. According to A.W., Brown then stated: "If I kill you though, I'm going to be the prime suspect. * * * I'm going to have to kill you and then I'll have to kill me. * * * You just lay there while I figure it out." *Id.*

{¶ 11} Desperate to escape the situation, A.W. testified that she agreed to drive Brown to his mother's house despite being intoxicated. A.W. claimed that Brown followed her closely as she walked to her truck and that when she sat in the driver's seat, Brown climbed over her to get to the passenger side so she could not leave without him. As A.W. drove Brown to his mother's house, she recalled Brown threatening to "snap [her] neck" if she got pulled over by the police. Tr. at 138.

{¶ 12} Once they arrived at Brown's mother's house, A.W. testified that Brown once again called her a "cheating whore" and poured a bottle of Mountain Dew on her. Tr. at 139. A.W. then claimed that as Brown was standing by her truck, he attempted to grab the keys from the ignition. A.W., however, was able to push Brown away and drive

off. After driving away, A.W. testified that she used her cell phone to call her best friend, Emily Carter, who did not answer. A.W. then tried to call Brown's mother to tell her that Brown was "acting crazy." *Id.* When Brown's mother did not answer, A.W. called Carter's boyfriend, Brian Forinash. Forinash answered A.W.'s call, which led to A.W. speaking with Carter. The State presented a call log from A.W.'s cell phone indicating that A.W. had made outgoing calls to Carter, Forinash, and Brown's mother between 1:03 a.m. and 1:06 a.m. on the morning in question. *See* State's Exhibit No. 15.

{¶ 13} After telling Forinash and Carter what had happened with Brown, A.W. went to their house in Riverside, Ohio, where Forinash called 9-1-1 to report the incident. The responding Riverside officer, Nick Toscani, testified that when he observed A.W. she was very upset, crying, and holding her arm up while sitting at a table. Both Forinash and Carter testified that A.W. appeared to have been beaten up when she arrived at their house. Forinash and Carter also testified that A.W.'s arm was in bad condition and that she was bleeding with bruises all over her body. The State admitted an audio recording of Forinash's 9-1-1 call and body-camera footage from Officer Toscani, which depicted A.W. crying and upset over the altercation with Brown. Due to the positioning of Officer Toscani's camera, A.W.'s injuries were not visible on the body-camera footage.

{¶ 14} After speaking with Officer Toscani, A.W. was taken by ambulance to the Grandview Hospital emergency room where she was treated by Dr. Sara Simpson. Dr. Simpson testified that A.W. had abrasions on her left knee and significant bruising around her left wrist and arm. Dr. Simpson also testified that an x-ray of A.W.'s left arm revealed a non-displaced fracture of the radius. Dr. Simpson further diagnosed A.W. with an "occult" wrist fracture, meaning the wrist fracture did not show up on the x-ray, but was

nevertheless apparent from A.W.'s physical exam. Dr. Simpson testified that she treated A.W.'s broken wrist with a splint and her broken arm with a sling. Dr. Simpson further testified that she prescribed ibuprofen for A.W.'s pain and ordered A.W. to follow up with an orthopedic specialist.

{¶ 15} Prior to receiving any medical treatment at the hospital, A.W. met with Officer Scott Short of the Huber Heights Police Department. Officer Short testified that he took pictures of A.W.'s injuries and spoke with A.W. regarding her injuries. In addition to the photographs taken by Officer Short, A.W.'s family took several photographs of her injuries later the same morning. A.W.'s father testified that A.W. appeared beaten up and upset when she came to his house following her release from the hospital. Her father also testified that when he and A.W. went to A.W.'s house later the same day, he noticed her home was trashed and that there were clumps of long hair on the kitchen and living room floor.

{¶ 16} In addition, A.W. testified that she had received some text messages from Brown after the altercation. At trial, the State presented a screen shot of the text messages. The screen shots indicated that, at 1:08 a.m., Brown texted A.W.: "What the Fuck do you want?" Ten minutes later, Brown texted A.W.: "Don't ever tell me you sucked a dick…dumbass." Then at 8:11 a.m. Brown texted A.W.: "Really you called the cops on my mom's birthday." *See* State's Exhibit No. 17.

{¶ 17} Brown testified in his defense and claimed that his actions towards A.W. were in self-defense. Specifically, Brown testified that, after A.W. admitted to having oral sex with the man from the concert, he stood up and said "you know, it would only take you a week to find another guy like that to already have sex with[.]" Tr. at 271.

Afterward, Brown claimed that he told A.W. "I'm leaving" and then tried to leave the residence. *Id.* However, according to Brown, when he walked from the living room to the front door to put on his shoes, A.W. came from the kitchen screaming "you're f-ing not taking my truck." Tr. at 273. Brown then recalled A.W. pushing him and grabbing his upper body. Brown claimed that A.W. got more and more aggressive and that A.W. had him by the ear and was pulling him backward.

{¶ 18} Continuing, Brown testified that he had to take A.W.'s arms and push her to the side so that he could put on his shoes. Brown claimed that A.W. then got down on the ground and grabbed him around the legs to prevent him from leaving. In order to free himself, Brown testified that he took the top of A.W.'s shoulder and pushed and pulled his feet from her grasp. As he continued to try to put on his shoes, Brown claimed that A.W. once again grabbed him by the legs. Brown then claimed that A.W. picked up the keys to her truck and pounded them into his right foot. In response, Brown testified that he reached down, grabbed A.W. by the arm, and twisted her off him using force. Brown claimed that he felt it was necessary to use force to remove A.W. since she stabbed him with her keys, and that he was simply acting in self-defense.

{¶ 19} Contrary to A.W.'s testimony, Brown claimed that he did not force A.W. to give him a ride home, but that he left A.W.'s house on his own volition and began to walk home. Brown testified that, after walking for 30 minutes, he reached a nearby Kroger where A.W. showed up in her truck. Brown testified that A.W. offered him a ride to his mother's house, which he accepted. When they reached his mother's house, Brown claimed that he got out of the truck and began walking away when he noticed A.W. attempting to park. Upon seeing this, Brown testified that he walked back to the truck

and told A.W. he did not want her there. Brown then admitted to calling A.W. an inappropriate name and dumping Mountain Dew on her. Thereafter, A.W. left, and Brown was arrested two days later.

{¶ 20} Although he claimed his foot was injured by A.W. stabbing him with her keys, Brown testified that he did not seek medical treatment for his foot until he was booked into jail. Brown, however, did not present any evidence confirming that he received medical treatment while in jail. Brown only presented a photograph of a mark on his foot that he claimed was caused by A.W. stabbing him with her keys. The photograph was taken by Brown's attorney approximately three months after the altercation with A.W.

{¶ 21} At the close of trial, Brown requested a jury instruction on misdemeanor assault as a lesser-included offense of felonious assault. Brown also requested a jury instruction on self-defense. The trial court gave an instruction on self-defense but declined to give an instruction on misdemeanor assault. Following deliberations, the jury returned a verdict finding Brown guilty of all the indicted charges. The trial court then sentenced Brown to a prison term of three years for felonious assault, 180 days for domestic violence, and four years for kidnapping, all to be served concurrently for a total prison term of four years.

{¶ 22} Brown now appeals from his conviction, raising two assignments of error for review.

### First Assignment of Error

{¶ 23} Brown's First Assignment of Error is as follows:

THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE DEFENDANT FOR FELONIOUS ASSAULT WHEN THE MANIFEST SUFFICIENT WEIGHT OF THE EVIDENCE FAILED TO LINK DEFENDANT-APPELLANT TO THE VICTIM'S INJURIES AND PROVE[D] BY A PREPONDERANCE OF EVIDENCE THAT DEFENDANT-APPELLANT ACTED IN A SUDDEN FIT OF PASSION OR RAGE.

{¶ 24} Under his First Assignment of Error, Brown contends that his felonious assault conviction was not supported by sufficient evidence and was against the manifest weight of the evidence. We disagree with Brown's claim.

*Sufficiency of the Evidence*

{¶ 25} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. A.W.*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "When reviewing a claim as to sufficiency of evidence, the relevant inquiry is whether any rational factfinder viewing the evidence in a light most favorable to the state could have found the essential elements of the crime proven beyond a reasonable doubt." (Citations omitted.) *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact." (Citations omitted.) *Id.*

{¶ 26} As previously noted, Brown contends that there was insufficient evidence

to support his felonious assault conviction under R.C. 2903.11(A)(1). Pursuant to that statute, a person commits felonious assault when he "knowingly * * * [c]ause[s] serious physical harm to another[.]" R.C. 2903.11(A)(1). Specifically, Brown claims that the State failed to establish A.W. suffered "serious physical harm." Brown also claims that the State failed to prove A.W.'s injuries were caused by Brown's actions.

{¶ 27} "Serious physical harm" is defined as "[a]ny physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity[.]" R.C. 2901.01(A)(5)(c). "Serious physical harm" also includes "[a]ny physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain." R.C. 2901.01(A)(5)(e).

{¶ 28} As noted above, A.W. testified that she and Brown got into a physical altercation after Brown learned that she had a sexual encounter with another man. A.W. testified that when she attempted to run away, Brown pulled her back inside the house by her arm. A.W. also testified that her arm began hurting as she was struggling to fight off Brown. A.W.'s friend, Carter, and Carter's boyfriend, Forinash, both testified that A.W. arrived at their house bloodied and bruised with an injured arm. The physician who treated A.W. at the hospital following the altercation also testified that A.W. had significant bruising around her left wrist and left upper arm. The physician confirmed that A.W. had a non-displaced fracture of her left radius, which was treated with a sling, and a fractured left wrist, which was treated with a splint.

{¶ 29} The photographs taken by Officer Short and A.W.'s family depict the bruises and abrasions on A.W.'s body, including her arm and wrist. A.W. testified that she

struggled with her wrist for four to five weeks after the incident and that she had trouble performing everyday tasks such as opening a water bottle, turning a door knob, putting on her bra, and buttoning her pants. Although A.W. testified that she tried lifting three pound weights at the gym three weeks after the incident, she was later told by her doctor to stop that activity, and thereafter focused on exercising only her lower body.

{¶ 30} Upon review, we find that the foregoing testimony and evidence sufficiently establish all elements of felonious assault under R.C. 2903.11(A)(1). In so holding, we disagree with Brown's claim that the evidence failed to demonstrate that A.W. suffered serious physical harm. In addition to abrasions and severe bruising, the evidence establishes that A.W. suffered broken bones in her left arm and wrist which caused her to be temporarily incapacitated to the extent that she could not perform everyday tasks for multiple weeks. Such injuries amount to sufficient evidence of "serious physical harm." *See, e.g., State v. Boyd*, 2d Dist. Montgomery No. 11659, 1990 WL 78595, *4 (June 5, 1990) ("[i]n pushing [the victim] to the ground Appellant caused her to suffer a broken arm, which constitutes serious physical harm as that term is used in the statute"); *State v. Manning*, 4th Dist. Adams No. 94 CA 582, 1995 WL 329583, *3 (May 26, 1995) (a nondisplaced fracture, swelling, and lacerations are injuries which "fall within the definition of serious physical harm"); *State v. Childers*, 4th Dist. Jackson No. 96 CA 785, 1997 WL 334994, *6 (June 11, 1997) (fractured ribs constitute serious physical harm).

{¶ 31} We also find no merit to Brown's claim that the State failed to prove that Brown's actions caused A.W.'s injuries. Although Brown claims it was possible for A.W. to have sustained her injuries when she fell down outside her house, both Brown and A.W. testified that Brown grabbed A.W.'s arm during the altercation. In fact, Brown

specifically testified that he pushed A.W., grabbed her by the wrist, and used force when he grabbed her by the arm. *See* Tr. at 278 and 306. Because there is evidence in the record indicating that Brown forcefully made contact with the areas of A.W.'s body that sustained broken bones, there was sufficient evidence that Brown's actions caused A.W.'s injuries.

{¶ 32} For the foregoing reasons, Brown's sufficiency-of-the-evidence claim lacks merit.

*Manifest Weight of the Evidence*

{¶ 33} In contrast to a sufficiency-of-the-evidence challenge, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *A.W.,* 2d Dist. Montgomery No. 22581, 2009-Ohio-525, at ¶ 12. When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 34} "Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses." *State v. Adams*, 2d Dist. Greene Nos. 2013 CA 61, 2013 CA 62,

2014-Ohio-3432, ¶ 24, citing *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *Id.*, citing *A.W.* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

**{¶ 35}** In this case, Brown claims that his conviction for felonious assault was against the manifest weight of the evidence because A.W.'s trial testimony was inconsistent and lacked credibility. The jury, however, heard all the testimony and was free to consider any inconsistencies and to determine what impact the inconsistencies had on A.W.'s credibility. While the jury may take note of the inconsistencies and resolve or discount them accordingly, such inconsistencies do not render a defendant's conviction against the manifest weight of the evidence. *State v. Eisenman*, 10th Dist. Franklin No. 17AP-475, 2018-Ohio-934, ¶ 9, citing *State v. Nivens*, 10th Dist. Franklin No. 95APA09-1236, 1996 WL 284714, *3 (May 28, 1996); *Hunter v. Hunter*, 2d Dist. Montgomery No. 21285, 2006-Ohio-6307, ¶ 9 ("[i]t has long been recognized that conflicting evidence and inconsistencies in testimony do not render a verdict against the manifest weight of the evidence"). Furthermore, after reviewing A.W.'s testimony, the inconsistencies that Brown complains of are either minor or later explained by A.W. on redirect examination.

**{¶ 36}** Brown also claims the weight of the evidence does not support his conviction because the photographic evidence of A.W.'s injuries was unjustly biased against him in that the photographs were taken by A.W.'s family and could have been manipulated. However, Brown fails to account for the fact that the police also took

photographs of A.W.'s injuries at the hospital shortly after the altercation. Regardless, the testimony of A.W.'s treating physician corroborates the fact that A.W. suffered severe injuries to her left arm and wrist as a result of the altercation with Brown.

**{¶ 37}** Brown also argues that the screen shots of the text messages admitted into evidence could have been manipulated by A.W. However, Brown never disputed the contents of the text messages at trial. *See* Tr. at 313-314.

**{¶ 38}** Having reviewed the record, we find the jury could have reasonably credited all the evidence presented by the State, including A.W.'s testimony regarding the altercation, and evaluated said evidence and all reasonable inferences to conclude that Brown was guilty of felonious assault. A.W.'s testimony regarding the altercation and her resulting injuries is corroborated by photographic evidence, phone logs, text messages, and witness testimony. Although Brown testified to a different version of events in which he claimed A.W. was the primary aggressor, it was the province of the jury to determine whether to credit A.W. or Brown's account. Therefore, based on the facts and circumstances of this case, we do not clearly find that the evidence weighs heavily against Brown's felonious assault conviction, or that a manifest miscarriage of justice has occurred.

**{¶ 39}** For the foregoing reasons, Brown's manifest weight challenge also lacks merit.

**{¶ 40}** Brown's First Assignment of Error is overruled.

## Second Assignment of Error

**{¶ 41}** Brown's Second Assignment of Error is as follows:

THE TRIAL COURT ERRED IN NOT PROVIDING THE JURY THE LESSER OFFENSE OF AGGRAVATED ASSAULT DESPITE SUBSTANTIAL EVIDENCE ALLUDING TO SERIOUS PROVOCATION AS WELL AS EVIDENCE SUPPORTING MINOR INJURIES, CONTRARY TO THE STATUTORY LANGUAGE REQUIRING SEVERE PHYSICAL INJURY.

**{¶ 42}** Under his Second Assignment of Error, Brown contends that the trial court erred in failing to instruct the jury on aggravated assault as an alternative to felonious assault. Although Brown claims aggravated assault is a lesser-included offense of felonious assault, we note that it is in fact an "inferior-degree offense" to felonious assault. *State v. Conley*, 2015-Ohio-2553, 43 N.E.3d 775, ¶ 32 (2d Dist). In *Conley*, we explained that:

> "In *State v. Deem*, 40 Ohio St.3d 205, 210, 533 N.E.2d 294 (1988), the Ohio Supreme Court held that aggravated assault is not a lesser-included offense of felonious assault. Rather, aggravated assault is an 'inferior-degree offense,' as it contains elements which are identical to the elements defining felonious assault, except for the additional mitigating element of serious provocation. Nevertheless, 'in a trial for felonious assault, where the defendant presents sufficient evidence of serious provocation, an instruction on aggravated assault must be given to the jury.' "

*Conley* at ¶ 32, quoting *State v. Morrow*, 2d Dist. Clark No. 2002-CA-37, 2002-Ohio-6527, ¶ 7, fn. 2, quoting *Deem* at paragraph four of the syllabus.

**{¶ 43}** Because Brown did not request a jury instruction on *aggravated* assault, all

but plain error has been forfeited. *Id.* at ¶ 29, citing *State v. Lott*, 51 Ohio St.3d 160, 167, 555 N.E.2d 293 (1990). "For plain error to exist, the defect in the trial proceedings must be obvious and must have affected the outcome of the trial." *Id.* at ¶ 30, citing *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, ¶ 16. "Notice of plain error 'is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' " *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 108, quoting *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶ 44} That said, "[a] criminal defendant has the right to expect that the trial court will give complete jury instructions on all issues raised by the evidence." (Citations omitted.) *State v. Williford*, 49 Ohio St.3d 247, 251, 551 N.E.2d 1279 (1990). "An instruction on aggravated assault is appropriate when the evidence supports a conviction for felonious assault, but the assault resulted from serious provocation by the victim." *Morrow* at ¶ 8, citing *Deem* at 210-211. Therefore, "[i]f a defendant, who is charged with felonious assault, presents sufficient evidence of serious provocation, the trial court must instruct the jury on aggravated assault." *State v. Thornton*, 2d Dist. Montgomery No. 20652, 2005-Ohio-3744, ¶ 50, citing *State v. Wong*, 95 Ohio App.3d 39, 641 N.E.2d 1137 (4th Dist.1994). Absent sufficient evidence of serious provocation, it is not plain error for a trial court to fail to sua sponte instruct the jury on aggravated assault. *State v. Moore*, 2d Dist. Montgomery No. 20005, 2004-Ohio-3398, ¶ 13.

{¶ 45} "Serious provocation is provocation that is 'sufficient to arouse the passion of an ordinary person beyond the power of his or her control.' " *Thornton* at ¶ 50, quoting *State v. Shane*, 63 Ohio St.3d 630, 635, 590 N.E.2d 272 (1992). "[S]erious provocation

has been described as provocation that is 'reasonably sufficient to bring on extreme stress and * * * to incite or to arouse the defendant into using deadly force.' " *Id.*, quoting *Deem,* 40 Ohio St.3d at 205, 533 N.E.2d 294. "Classic examples of serious provocation are assault and battery, mutual combat, illegal arrest and discovering a spouse in the act of adultery." *Id.*, citing *Shane* at 635.

**{¶ 46}** "The serious provocation analysis contains an objective and a subjective component." *State v. Laraby*, 2d Dist. Montgomery No. 27466, 2018-Ohio-113, ¶ 19. "The objective piece is whether the provocation was sufficient to incite an ordinary person into the use of force." *Id.*, citing *State v. Beatty-Jones*, 2d Dist. Montgomery No. 24245, 2011-Ohio-3719. (Other citation omitted.) "The subjective piece is a determination of whether the defendant actually acted 'under a sudden passion or in a fit of rage.' " *Id.*, quoting *Beatty-Jones* at ¶ 22, citing *Thornton* at ¶ 51.

**{¶ 47}** "Generally, a self-defense instruction is inconsistent with a serious provocation theory." *State v. Andrews*, 8th Dist. Cuyahoga No. 93104, 2010-Ohio-3864, ¶ 31, citing *State v. Crim*, 8th Dist. Cuyahoga No. 82347, 2004-Ohio-2553. "In most cases, an aggravated assault instruction is incompatible with an instruction on self-defense, so that both cannot be given together." *State v. Shepherd*, 2017-Ohio-328, 81 N.E.3d 1011, ¶ 26 (12th Dist.), citing *State v. Owens*, 5th Dist. Richland No. 2004-CA-87, 2005-Ohio-4402, ¶ 31, citing *State v. Beaver*, 119 Ohio App.3d 385, 397, 695 N.E.2d 332 (11th Dist.1997). However, this court has held that "where there is both evidence that might support a finding of self-defense and evidence that might support a finding that an assault was committed under the influence of sudden passion or in a sudden fit of rage brought on by serious provocation occasioned by the victim that is reasonably sufficient

to incite the defendant into using deadly force, the defendant is entitled to both an instruction on self-defense and an instruction on Aggravated Assault[.]" *State v. Cunningham*, 2d Dist. Clark No. 2759, 1991 WL 216410, *3 (Oct. 17, 1991). "For instance, an aggravated assault instruction could be given in a self-defense case where a defendant exceeded the amount of force necessary for his defense, out of passion or rage." *Shepherd* at ¶ 26, citing *Owens* at ¶ 31.

**{¶ 48}** In this case, Brown claims there was evidence of serious provocation warranting a jury instruction on aggravated assault because the record establishes he became enraged after A.W. admitted to having a sexual encounter with another man and after she stabbed him in the foot with her keys. Brown, however, proceeded on a theory of self-defense at trial and nothing in Brown's own testimony indicates that he acted under a sudden passion or fit of rage during the altercation. For example, on cross-examination, Brown testified as follows:

Q.     All right. And at a certain point you said Ms. [A.W.] was looking at her phone and she told you about something that had happened with [another man]?

A.     Yes.

Q.     Did that upset you?

A.     It had me kind of, you know—it had me upset.

* * *

Q.     In response to that did you call Ms. [A.W.] a cheating whore?

A.     No, not at that particular moment I didn't.

Q.     Did you call her that later at some point?

A.     I don't know if it was in the same order as that, but I do remember calling her a whore.

Q.     And the two of you get into an argument at that point?

A.     Not really a total argument. I just, you know, kind of told her I was leaving.

Tr. at 303-304. Later, when the State asked Brown again if it was "fair to say that you were angry at [A.W.]?" Brown merely responded: "I guess so." Tr. at 315.

**{¶ 49}** We also note that Brown's testimony does not demonstrate that he became enraged when A.W. allegedly stabbed him in the foot with her keys:

Q.     Okay. And you said she grabbed you around the legs Indian style and you pushed her on her shoulders to get her off of you?

A.     Yeah, I pushed her down and pulled my legs out from her.

Q.     Okay. And she picked up her car keys and that's the part where she stabs you in the foot?

A.     Yeah. Close to that, yeah.

Q.     And you said that your reaction was you grabbed her arm and twisted her off. Is that correct?

A.     Yeah, that's how I kind of recall it. It just was a, you know—just a reaction. Something stuck in my foot. I just reached down and kind of got whatever it was off of me realizing it was a key."

Tr. at 306-307.

**{¶ 50}** Although Brown's testimony does not satisfy the subjective component of the serious provocation analysis, A.W., nevertheless, testified that Brown "lost control"

and started "acting crazy" when he found out about her sexual encounter with another man. Tr. at 127-128, 139. While A.W.'s testimony could arguably serve as evidence that Brown acted under a sudden passion or fit of rage, we nevertheless find that, under the particular circumstances of this case, the trial court's failure to sua sponte instruct the jury on aggravated assault does not rise to the level of plain error.

{¶ 51} By proceeding on a theory of self-defense at trial and by failing to request an aggravated assault instruction after the trial court declined an instruction on misdemeanor assault, Brown " ' "* * * elected to seek acquittal [through self-defense] rather than invite conviction of the lesser offense." ' " *State v. Harris*, 8th Dist. Cuyahoga No. 57148, 1990 WL 84283, *2 (June 21, 1990), quoting *State v. Clayton*, 62 Ohio St.2d 45, 47, 402 N.E.2d 1189 (1980), quoting *United States v. Meyers*, 443 F.2d 913, 914 (9th Cir.1971).

{¶ 52} In *State v. Wine*, 140 Ohio St.3d 409, 2014-Ohio-3948, 18 N.E.3d 1207, the Supreme Court of Ohio explained that:

In *Clayton*, this court held that defendant's counsel's decision not to request an instruction on lesser included offenses—seeking acquittal rather than inviting conviction on a lesser offense—was a matter of trial strategy. * * * This court essentially said in *Clayton's* second footnote that although the trial court erred in not including the lesser-included-offense charge, the defendant waived that error in furtherance of his counsel's trial strategy. Once the defendant made his tactical gambit, * * * he could not then successfully claim plain error upon appeal. This court thus concluded that the trial court's failure to instruct the jury on lesser included offenses and

the defendant's subsequent conviction "[did] not amount to a manifest miscarriage of justice and [was] not plain error." [*Clayton*] at 47-48, 402 N.E.2d 1189.

*Wine* at ¶ 30.

{¶ 53} Simply put, Brown could have, but did not, request an instruction on aggravated assault. After the trial court foreclosed the possibility of a misdemeanor assault instruction, it was Brown's trial strategy to proceed solely on the theory of self-defense in an effort to obtain an acquittal as opposed to a conviction for a lesser felony offense. We presume such a trial strategy was employed because Brown's own testimony did not reflect that he acted under a sudden passion or in a fit of rage. Instead, Brown attempted to portray himself as the calmer more rational party to the altercation, as he claimed he just wanted to get A.W. off him and leave the residence. Under these circumstances, the trial court's failure to instruct the jury on aggravated assault does not rise to plain error.

{¶ 54} Brown's Second Assignment of Error is overruled.


**Conclusion**

{¶ 55} Having overruled both assignments of error raised by Brown, the judgment of the trial court is affirmed.


. . . . . . . . . . . . .


DONOVAN, J. and FROELICH, J., concur.

Copies mailed to:

Mathias H. Heck, Jr.
Andrew T. French
Charles W. Slicer, III
Hon. Timothy N. O'Connell