[Cite as *State v. Dyer*, 2024-Ohio-3421.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 2023-CA-34 |
| | : | |
| v. | : | Trial Court Case No. 23-CR-109(A) |
| | : | |
| JEFFREY DYER III | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on September 6, 2024

. . . . . . . . . . .

CATHERINE H. BREAULT, Attorney for Appellant

ROBERT C. LOGSDON, Attorney for Appellee

. . . . . . . . . . . .

LEWIS, J.

{¶ 1} Defendant-Appellant Jeffrey Dyer, III [1] appeals from his conviction for attempted murder in the Clark County Common Pleas Court following a jury trial. Dyer raises five assignments of error alleging: 1) he was denied his right to effective assistance of counsel; 2) the trial court abused its discretion in accepting Dyer's waiver of a conflict of interest; 3) the trial court abused its discretion in excluding certain evidence; 4) the trial court erred in refusing to instruct the jury on the inferior-degree offense of aggravated assault; and 5) Dyer's convictions were against the manifest weight of the evidence. For the following reasons, the judgment of the trial court will be affirmed.

## I. Procedural History and Facts

{¶ 2} On February 22, 2023, Dyer was indicted on one count of attempted murder, in violation of R.C. 2903.02(A) and R.C. 2923.02(A), a felony of the first degree, and one count of felonious assault, in violation of R.C. 2903.11(A)(2), a felony of the second degree. Each count included a three-year firearm specification. Co-defendant Kitana Newby was charged for the same offenses in the same indictment. The events giving rise to the indictment occurred on January 29, 2022, when Newby and Dyer got into an altercation with J.W., which culminated in Dyer's shooting J.W. in the neck at a Speedway gas station in Springfield, Ohio.

{¶ 3} Dyer and Newby retained the same attorney to represent them at trial. A joint scheduling conference was held on March 20, 2023, at which counsel indicated that

---

[1] We are aware that the spelling of Dyer's first name is listed as "Jeffery" in the indictment and in the case captions of some documents filed in the trial court. However, we use "Jeffrey" in this opinion, as that was the spelling used in the trial court's judgment entry. *See* App.R. 3(D) (requiring that, in the notice of appeal, "[t]he title of the case shall be the same as in the trial court . . .")

he represented both Dyer and Newby, and a discussion was held on the record regarding a possible conflict of representation. At that time, counsel denied there was any conflict but indicated to the court that he would likely know if any possible conflict arose within the next two weeks. The court explained that if there was a conflict, then it would immediately appoint the public defender's office to represent one of the defendants.

{¶ 4} Immediately prior to trial on June 6, 2023, the trial court reviewed a waiver of conflict-of-interest form with both co-defendants to continue counsel's joint representation. Both Dyer and Newby agreed to waive any conflict of interest and signed a waiver in open court on the record.

{¶ 5} At trial, the following testimony was presented. Rebecca Taylor testified that around 8 p.m. on January 29, 2022, she drove her GMC Terrain into the Speedway gas station at the corner of Derr and Villa Roads in Springfield. While her car was parked, she was listening to the radio and noticed J.W.'s truck stop at the entrance by Villa Road. Taylor testified that J.W. got out of the truck and Newby got out of a gold car. Newby and J.W. were yelling at each other, but Taylor could not make out what was said. Taylor observed Dyer exit Newby's car, grab Newby around the waist, and turn her around to go back to the car. According to Taylor, although "the bickering was still going on," she thought the incident was over when Newby turned to go to the car and J.W. turned to go back to his truck. However, as J.W. started to go to his truck, Dyer reached into his white hoodie pocket, pulled out a gun, and shot J.W. J.W. was about five feet away from his truck and was in the middle of turning when he was shot. Taylor had not observed any threatening acts from J.W. and stated that J.W. was not moving toward Dyer when he

was shot. People ran over to help J.W. while Taylor went inside Speedway to get gloves for a nurse to put pressure on J.W.'s gunshot wound.

{¶ 6} Melissa Mitchem, a home health nurse, testified that she was in the Rose's Discount Store parking lot, about 150-200 feet away from the Speedway gas station, on the evening of January 29, 2022. Although Mitchem heard arguing, she could not make out specific words, just the tone of voice. Mitchem heard a gunshot and saw J.W. fall toward the back end of his truck. She stated that J.W. did not make any movements toward anyone when the gunshot went off and she watched him fall "like a noodle." Based on how J.W. fell, Mitchem believed he was either dead or paralyzed. Mitchem's husband drove her over to J.W., and she held pressure on his neck until medics arrived.

{¶ 7} Raven Anderson testified that she was working in the Speedway on the night of the shooting. While waiting on customers, she heard arguing outside in the pump lot. She saw interaction among three people: one on one side of the pump and two on the other side. Although she could not hear all the words in the argument, Anderson did hear a female say, "I am going to shoot," shortly before she heard a gunshot. After the gunshot, Anderson immediately called 911, and that call was played for the jury. Store patrons were able to provide a partial license plate to the 911 operator as Newby and Dyer left the Speedway in a gold four-door Honda Accord.

{¶ 8} Surveillance video from the Speedway was introduced during Anderson's testimony. She identified Newby's vehicle arriving at the gas station and circling around to park at Pump 5, whereas J.W.'s truck pulled up and stopped at Pump 6 on the opposite side of Pump 5. Anderson testified that when J.W. was leaving, Newby and Dyer started

to follow the truck, and then J.W. stopped and got out of his truck. Anderson decided she needed to call 911 when she saw J.W.'s truck stop. Anderson testified that she saw two people walking away from J.W. after he was shot. She identified J.W. as wearing a dark blue or black coat and Dyer as wearing a white hoodie at the time of the shooting.

{¶ 9} Anderson wrote a statement on the night of the shooting, which was read to the jury during her re-direct examination over the objection of defense counsel. In the statement, she stated that when J.W. went to drive away, Newby kept yelling and Anderson heard Newby say she would shoot J.W. She wrote that J.W. stopped his truck, got out, and yelled back at Newby and Dyer. When Newby and Dyer walked toward J.W., they started to scream and shout. Anderson wrote that when she got to the doors of the store, she heard a pop and then Newby and Dyer fled in their gold Honda Accord. She also wrote that Dyer was wearing a white shirt and Newby was wearing a red head wrap. According to Anderson's statement, Newby was yelling about J.W. "being on her car and damages being done."

{¶ 10} John Eldridge testified that he was at the Speedway on the night of the shooting and observed a truck sitting near the exit. Eldridge was about to leave when he heard a bunch of arguing, but he could not make out the words. He then heard a gunshot and saw a young man (Dyer) wearing a white t-shirt and tan pants walk briskly from the truck to the gold Honda Accord. The man was stuffing a pistol into his pocket as he walked away. Eldridge also heard Newby "still rattling on about something" in an angry, aggressive tone after J.W. was shot.

{¶ 11} Damian Gibson testified that he was at the Speedway on the night of the

shooting and heard arguing from inside his vehicle. Gibson saw J.W.'s truck pull away very fast, then slam on the brakes. Gibson saw J.W. get out of the truck and walk not more than six feet away from the back of his truck. He also saw Newby and Dyer walk toward J.W. Gibson only heard Newby yelling and arguing with J.W. and did not hear anything from Dyer. According to Gibson, J.W. and Newby were arguing face-to-face, but not quite close enough to reach each other. Gibson testified that he saw J.W. flinch at Newby, but there was no touching or hitting, just arguing between the two. He also denied hearing any threats. Gibson later described that the flinch was not an "aggressive approach" and that J.W. may have "just jerked a little bit." He denied that J.W. had lunged at anyone. Gibson then heard a gunshot and saw J.W. instantly fall to the ground, while Newby and Dyer ran back to their car and left. Although Gibson did not observe Dyer arguing with J.W., Dyer was behind Newby the entire time and tried unsuccessfully to bring her back to their car. Gibson denied that anyone touched J.W.'s truck during the incident. He further stated that Dyer had pulled the pistol out of his pocket and shot J.W. using his right hand.

{¶ 12} Brooklyn Miller testified that she was at the Speedway on the night of the shooting with her boyfriend, Gibson. While sitting in Gibson's vehicle, she heard J.W. and Newby arguing, but Dyer remained quiet. At some point, Miller heard the words "shooting" or "shoot you" in a female voice. Miller saw J.W. get out of his truck and stand outside while continuing to argue with Newby and Dyer. She observed Newby and J.W. "flinching towards each other," but nothing touched. Then Miller saw Dyer grab Newby by the back of her shirt, swing her around, run up to J.W., and shoot him. According to

Miller, J.W. was turning around to go back to his truck when he was shot. Miller recalled Dyer wearing white or gray and Newby wearing something red.

{¶ 13} Springfield Police Officer Beau Ray and his partner responded to the shooting at Speedway. Officer Ray observed J.W. "laying on the ground on his back" to the rear of the driver's side of the truck on the north side of the parking lot. He stayed with J.W. until paramedics arrived to take over. Christopher Ammons, a firefighter and paramedic for Springfield Fire and Rescue, took over applying pressure to J.W.'s neck when he arrived on scene. Ammons observed a gunshot wound to the left side of J.W.'s neck that was bleeding out. J.W. was taken to Springfield Regional Medical Center Emergency Room for treatment.

{¶ 14} Springfield Police Officer Allison Craig was the evidence technician dispatched to the Speedway after the shooting. By that time, J.W. had already been removed from the scene and taken to the hospital. Officer Craig placed yellow placards down to mark evidence pertinent to the investigation and took photographs of the scene. She marked the location of a 9mm spent shell casing that was recovered and places where blood had been found around the truck. She testified that the driver's side front door of the truck had been left open and that no weapons were observed in the truck.

{¶ 15} Sergeant James Byron of the Springfield Police Department acted as a blind administrator of two photo arrays of six photos each to J.W. while he was still in the hospital. J.W. positively identified Newby in the first array, stating that she had been wearing red the day of the shooting. In the second array, J.W. identified Dyer, stating "He looks familiar. Something in my heart says that's him."

{¶ 16} J.W., who was 38 years old at the time of the trial, stated that, on the day of the shooting, he pulled behind the Honda driven by Newby while heading north on Limestone Street at a stoplight at Home Road. Newby had a right turn signal on and there was a "do not turn on red" sign. As J.W. pulled behind the Honda, Newby "scooted forward," so he "scooted closer" to the car, but the car did not turn until the light turned green. Newby turned into the outside lane closest to oncoming traffic, and J.W. turned into the inside lane. According to J.W., when he looked over, Newby was "pointing and yelling and giving the finger," but J.W. thought Newby was arguing with Dyer, who was sitting in the passenger seat of the Honda. J.W. started to speed up and noticed that Newby was trying to keep up with him. In order to get away from them, J.W., who was normally a "pretty fast" driver, sped up to "close to a hundred miles an hour" down Home Road toward the light at Derr Road, and he believed the Honda was no longer behind him.

{¶ 17} J.W. got into the left lane on Home Road, then turned into the right-hand lane on Derr Road, because he was planning to make a right-hand turn onto Vester Avenue. As he reached Vester, he heard honking and saw that Newby was driving next to him. Newby was "pointing and yelling and giving [him] the bird," so he decided to follow them to Speedway, thinking that they were trying to get his attention for some reason.

{¶ 18} When J.W. pulled into the Speedway, he stopped and yelled out of his truck window, "hey, what's the problem?" According to J.W., Dyer never said anything to him, but Newby jumped out of the car and started yelling at him, saying that he had been

tailgating her. She threatened to "whoop [J.W.'s] ass" and said J.W. did not know who he was talking to. J.W. testified that he yelled back, saying that he did not want any problems and that they did not want to do this. As J.W. started to drive away, Newby yelled, "I'll f****** kill you." J.W. then stopped his truck almost at the exit and got out, leaving the driver's side door open. J.W. claimed he got out of his truck to "see if it was gonna happen, really." He walked to the back of his truck and yelled, "Do you know who I am?" Although J.W. acknowledged that the question could have been taken a different way, he claimed it was a rhetorical question and that "it wasn't a question of me personally. It was a question of do you know who God is." At the time, J.W. was on a "spiritual journey" and had just finished writing a book called "Finding God Through Looking Into Self." Newby yelled back at him, "I don't give a f*** who you are," then walked up and spit in J.W.'s face. J.W. recounted that Newby and Dyer had been at the pump whereas J.W. had been only two or three feet away from his truck, "so they literally had to walk up on – me, ran up on me," and the interaction happened so fast he did not have time to react. According to J.W., Dyer was standing right behind Newby when she spit, trying to grab her and pull her back. J.W. wiped the spit off his face, said "you got it," turned around, and started to walk back to his truck. But as he turned to the right, J.W. heard a bang, and he was shot in the left side of his neck. The shot shattered J.W.'s fifth and sixth vertebrae and paralyzed him from the chest down.

{¶ 19} J.W. estimated he was about two or three feet away from the back of his truck when he got shot and was next to his truck when he fell. J.W. testified that he had not been carrying any weapons, had made no threats, and "had no ill will." He did not

see Dyer with a gun and did not know which of the defendants had shot him. J.W. denied darting toward Dyer or Newby or taking an aggressive step toward them. J.W. testified that had he been moving toward Dyer when the gun went off, he would have been shot in the face instead of the back side of his neck.

{¶ 20} At the hospital, J.W. identified Newby and Dyer in photo arrays, and he later identified them in court. J.W. explained that Newby was the individual he had argued with, who had driven the Honda and spit in his face. J.W. stated that Newby had worn a dark colored hoodie and that Dyer had worn a white hoodie at the time of the shooting. J.W. admitted that he had posted a Facebook video when he was in the hospital in which he talked about the incident.

{¶ 21} Detective Daniel DeWine was the lead detective on the case; he had since retired from the Springfield Police Department after 31 years. He testified that he had been called to the Speedway on the night of the shooting. By the time Detective DeWine arrived on scene, J.W. had already been taken to the hospital. He observed a 9mm spent shell casing, which was located a little to the east and toward the rear of the truck. According to Detective DeWine, on a semi-automatic handgun, when the trigger is pulled and a round is fired, the slide comes back and the shell casing that was just fired is ejected to the right. Therefore, the person that fired the shot at Speedway would have been standing close to the truck and would have been "within at least six feet" of J.W. at the time the gun was fired.

{¶ 22} Detective DeWine testified that the Speedway surveillance video showed two figures approach the truck and then come back; one was the "young man with the

white sweatshirt." In a video from a nearby McDonald's, Detective DeWine also identified a person in a white shirt who went toward the truck for "just a second or so" and then walked back over to a car (Newby's Honda) before the car headed north on Derr Road. DeWine testified that the video showed J.W. never left the area of his truck when he got out of it, and then "within seconds" a shot was fired that disabled J.W.

{¶ 23} Based on a witness's description of a partial license plate for the Honda, officers were able to connect Newby's name with the vehicle. Detective DeWine obtained additional information from the Clark County Sheriff's Department that provided Dyer's name. Detective DeWine put together the two photo arrays that Sergeant Byron administered to J.W. On the night of the shooting, J.W.'s truck had been impounded, and a subsequent search of the truck had yielded no weapons. Neither Newby nor Dyer contacted law enforcement about the incident prior to the indictment.

{¶ 24} Following the State's case, Dyer testified as the only witness for the defense. Prior to trial, Dyer had filed a notice of intent to claim self-defense. Thus, Dyer did not deny that he shot J.W. but claimed that he did so in self-defense. Dyer testified that he had been 18 years old on the day of the shooting and had been in a relationship with Newby. They were in Newby's vehicle heading to Dyer's mother's house to do laundry. According to Dyer, he was sleeping in the car while Newby was driving when he jerked awake and heard Newby yelling and screaming. When he looked up, he saw J.W. staring down at them from his truck with "really wide eyes." According to Dyer, J.W. pushed them into the opposite side of traffic and then sped off quickly. When he and Newby reached Derr Road, they turned left and noticed J.W.'s truck again. As J.W.

was about to turn onto Vester, he slammed on his brakes, causing Newby and Dyer to almost hit the back of J.W.'s truck. Instead, they swerved around him and went into the other lane. Newby honked her horn at J.W. and then pulled into the Speedway. Dyer saw J.W. turn onto Vester after he brake-checked them and thought everything was over.

{¶ 25} Dyer testified that, when Newby pulled into the Speedway, she did a U-turn and pulled around to the pump on the outside. Once they parked, Dyer opened his door but had not yet stepped out when J.W.'s truck pulled into the Speedway and J.W. started screaming at them. According to Dyer, J.W. screamed and called them names. J.W. asked if they knew who he was, claimed he "had something for them," and waived something inside the truck. Dyer denied saying anything to J.W. but admitted that Newby was yelling back at him. Dyer testified that Newby called J.W. "the B word" as J.W. started to drive off, and that was when J.W. slammed on his brakes.

{¶ 26} When J.W.'s truck stopped, J.W. got out of his truck and started to approach them. Dyer denied following J.W.'s truck and denied going toward J.W.'s truck. Dyer claimed that he stayed next to the pumps almost the whole time and that J.W. and Newby met in the middle, between the pump and J.W.'s truck. Dyer went to grab Newby to de-escalate the situation, but she would not come with him. Dyer stated that he stepped back toward the pumps because he was in fear for himself and was scared. Newby kept arguing with J.W., who started backstepping toward his truck. J.W. made it halfway back to his truck and then came back toward them a second time. Dyer testified J.W. had started to go back to his truck when Newby spit on J.W. Dyer stated that J.W. went back to his truck, "touched the door handle," then "made a full sprint towards [Dyer] with his

hands up in the air." Trial Tr. 488. Dyer stated that he only fired one shot because he was not trying to hurt J.W., only to scare him away. Dyer admitted that he should not have shot at J.W. but claimed that he was in fear for his life and did not know what else to do. Dyer testified that he felt like J.W. had grabbed something, like a knife or a gun, when he went back to his truck, based on J.W.'s prior statement while in his truck that he "had something for [Dyer]."

{¶ 27} Dyer admitted that he owned a 9mm handgun that he had kept in the center console of Newby's car. He claimed to carry the gun for protection because he had lost a lot of friends to gun violence. According to Dyer, his car had been shot at two weeks prior to the shooting at Speedway, which caused him to get his own gun because he was scared. Dyer stated that when J.W. pulled up, he got the gun out of the console and put it on the seat. He claimed that he got out of the car and was going to walk to the store but instead stayed next to the pump the whole time. Dyer denied approaching J.W. and stated that the person in the white shirt in the surveillance videos who approached J.W. was Newby, not him, because he was wearing a dark grey sweatshirt, whereas Newby was wearing a white jacket and red pants. Dyer claimed that he shot J.W. while he was standing by the pump and that, when J.W. was running toward him with his hands in the air, J.W. had turned his head, which resulted in J.W.'s getting shot in the back of the neck.

{¶ 28} Dyer was found guilty as charged. At sentencing, the trial court merged the attempted murder and felonious assault charges, and the State proceeded on the attempted murder charge. Dyer was sentenced to an indefinite prison term of a minimum of 8 years and a maximum term of 12 years. Dyer was also ordered to serve a

mandatory three-year term of incarceration prior and consecutively to his indefinite prison sentence on the firearm specification.

{¶ 29} Dyer filed a timely notice of appeal and raises five assignments of error for our review.

## II.    First Assignment of Error

{¶ 30}  In his first assignment of error, Dyer alleges the following:

APPELLANT WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AMENDMENT OF THE U.S. CONSTITUTION AND ARTICLE I, SECTION 10, OF THE OHIO CONSTITUTION WHERE TRIAL COUNSEL'S CUMULATIVE DEFICIENCIES PREJUDICED HIS RIGHT TO A FAIR TRIAL.

{¶ 31} Dyer presents three arguments that allege his trial counsel was ineffective. First, Dyer claims he was prejudiced by counsel's dual representation, which included a failure to file a motion to sever the co-defendant's trial.  Second, he argues that his counsel was ineffective by failing to develop a cohesive trial strategy throughout the trial. Finally, Dyer alleges that his trial counsel's conduct throughout the trial was so unprofessional as to fall below an objective standard of reasonableness, which prejudiced his right to a fair trial.

{¶ 32} The State responds that Dyer validly waived his attorney's potential conflict of interest and that counsel's actions during trial did not rise to the level of ineffective assistance.   Further, the State contends that trial counsel did employ a consistent theory of the case that reflected the evidence presented at trial.   Finally, the State argues that

even if his counsel was deficient, Dyer did not establish any prejudice because the evidence of guilt was overwhelming, and counsel's actions amounted to trial strategy.

{¶ 33} "Reversal of a conviction on the grounds of ineffective assistance of counsel requires a showing, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive defendant of a fair trial." *State v. Treesh*, 90 Ohio St.3d 460, 489 (2001), citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "The failure to make a showing of either deficient performance or prejudice defeats a claim of ineffective assistance of counsel." *State v. Blanton*, 2023-Ohio-89, ¶ 56 (2d Dist.), citing *Strickland* at 697.

{¶ 34} To prove deficient performance, a defendant must show that "counsel's performance fell below an objective standard of reasonable representation." *Strickland* at 688. In evaluating counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id.* at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955). "The adequacy of counsel's performance must be viewed in light of all of the circumstances surrounding the trial court proceedings." *State v. Jackson*, 2005-Ohio-6143, ¶ 29 (2d Dist.), citing *Strickland*. "Hindsight may not be allowed to distort the assessment of what was reasonable in light of counsel's perspective at the time." *Id.*, citing *State v. Cook*, 65 Ohio St.3d 516, 524 (1992).

{¶ 35} "To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that,

were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley,* 42 Ohio St.3d 136 (1989), paragraph three of the syllabus. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694.

{¶ 36} When reviewing ineffective assistance of counsel claims, an appellate court "will not second-guess trial strategy decisions, and 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " *State v. Mason*, 82 Ohio St.3d 144, 157 (1998), quoting *Strickland* at 689. "Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available." *State v. Conley*, 2015-Ohio-2553, ¶ 56 (2d Dist.), citing *Cook* at 524-525. The defendant bears the burden of demonstrating that counsel was ineffective because, in Ohio, a properly licensed attorney is presumed competent. *State v. Lytle*, 48 Ohio St.2d 391, 397 (1976).

### A.    Conflict of Interest

{¶ 37} Under his first argument, Dyer contends that counsel was ineffective because there was an actual conflict of interest based on counsel's joint representation of Dyer and Newby.   Dyer further argues that his counsel was ineffective for failing to file a motion to sever the trial of the co-defendants because the joint trial resulted in actual prejudice.

{¶ 38} When a defendant alleges ineffective assistance of counsel based on a conflict of interest, the standard used to determine the existence of ineffective assistance

of counsel is different than that used in other instances. *State v. Cranford*, 2011-Ohio-384, ¶ 61 (2d Dist.). In those cases, the defendant is not required to demonstrate that he or she has been prejudiced by counsel's deficient performance because prejudice is presumed "if the defendant demonstrates that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance." *Id.*, citing *Strickland* at 692. Accordingly, "[i]n order to satisfy a Sixth Amendment claim of ineffective assistance of counsel, appellant must demonstrate that an actual conflict of interest adversely affected his counsel's performance." (Citations omitted.) *State v. Keith*, 79 Ohio St.3d 514, 535 (1997). "Raising the *possibility* of a conflict of interest is insufficient." (Emphasis in original.) *State v. Williams*, 2021-Ohio-3152, ¶ 8, citing *State v. Manross*, 40 Ohio St.3d 180, 182 (1988). Rather, an actual conflict of interest must be shown. *State v. Hathaway*, 2015-Ohio-5488, ¶ 13 (2d Dist.), citing *State v. Gillard*, 78 Ohio St.3d 548, 552 (1997). Until a defendant demonstrates that an actual conflict of interest adversely affected his counsel's performance, he has not established the constitutional predicate for his claim of ineffective assistance of counsel. *Manross* at 182, citing *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980).

{¶ 39} "[W]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat v. United States*, 486 U.S. 153, 159 (1988). Accordingly, the right to counsel also includes a "correlative right to representation free from conflicts of interest." *State v. Gillard*, 64

Ohio St.3d 304, 311 (1992). "Defense counsel has a duty to provide effective, conflict free assistance of counsel under the Sixth Amendment and its supporting caselaw . . . and pursuant to the Ohio Rules of Professional Conduct." *Williams* at ¶ 6, citing *Cuyler* at 345. "Requiring or permitting a single attorney to represent codefendants, often referred to as joint representation, is not *per se* violative of constitutional guarantees of effective assistance of counsel. This principle recognizes that in some cases multiple defendants can appropriately be represented by one attorney; indeed, in some cases, certain advantages might accrue from joint representation." *Holloway v. Arkansas*, 435 U.S. 475, 482 (1978). "An attorney representing multiple defendants in criminal proceedings is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop during the course of the trial." *State v. Seals*, 2005-Ohio-4837, ¶ 14 (2d Dist.), citing *Manross*. A trial court's duty to inquire into a possible conflict of interest arises "when the court knows or reasonably should know that a possible conflict of interest exists or when the defendant objects to the multiple representation." *State v. Dillon*, 74 Ohio St.3d 166, 168 (1995), citing *Manross* at 181.

{¶ 40} "The term 'conflict of interest' involves circumstances in which regard for one duty tends to lead to disregard of another duty, such as when there is representation of multiple clients with incompatible interests." *Hathaway* at ¶ 14, citing *Gillard* at 552-553. "A possible conflict of interest exists where the interests of the defendants *may* diverge at some point, so as to place the attorney under inconsistent duties, but an actual conflict of interest is shown where during the course of the representation the defendants' interests *do* diverge with respect to a material factual or legal issue or to a course of

action." (Emphasis in original.) *Seals* at ¶ 16, citing *Gillard* at 552-553. "In order to demonstrate an actual conflict of interest based upon what an attorney has failed to do, a defendant must demonstrate that [some] plausible alternative defense strategy or tactic that has sufficient substance to be at least viable might have been pursued but was not undertaken due to the attorney's conflicting loyalties or interests." *Hathaway* at ¶ 14, citing *Gillard* at 553.

{¶ 41} In this case, neither Newby nor Dyer objected to the dual representation. Therefore, it is Dyer's burden on appeal to "demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Manross* at 182, citing *Cuyler* at 348.

{¶ 42} Dyer and Newby jointly retained defense counsel to represent them from the outset of the case. At the joint scheduling conference held on March 20, 2023, a discussion was held on the record in front of both Dyer and Newby regarding a possible conflict of representation. At that time, counsel denied there was any conflict but indicated to the court that he would likely know if any possible conflict existed within the next two weeks. The court explained that if there was a conflict, then it would immediately appoint the public defender's office to represent one of them. No indication of a conflict of interest arose, and the case proceeded to trial.

{¶ 43} On the first day of trial, the trial court inquired of Dyer and Newby individually whether defense counsel had discussed a waiver of potential conflict with them. It addressed Dyer personally and reviewed the entirety of the waiver on the record. After verifying that Dyer indeed wished to have defense counsel represent him and his co-defendant jointly for trial, Dyer signed a written waiver of conflict. Trial Tr. 13-15. The

written waiver was also signed by defense counsel and the court and was filed with the clerk.[2] The trial court likewise reviewed the waiver with Newby and confirmed that she too wished to proceed to trial jointly. At no time did either Dyer or Newby object to the joint representation. Defense counsel was in the best position to know of the existence of any conflict both before and during trial. While Dyer questions the timing of the execution of the waiver of conflict, he also acknowledges that his and Newby's alleged "antagonistic defenses were foreseeable," and he chose nonetheless to execute the waiver. We conclude that Dyer executed a valid waiver of the potential conflict of interest, and the court was under no duty to further inquire.

{¶ 44} Nevertheless, Dyer suggests that an actual conflict existed in defense counsel's representation because the evidence against one defendant (Dyer) was portrayed as stronger than the evidence against the other (Newby) based on the opening statements and references to Dyer as "the shooter." However, we cannot conclude on this record that an actual conflict existed. There was no question that Dyer was the shooter, and he testified as such during the trial. The issue in controversy was whether Dyer acted in self-defense when he shot J.W. Thus, referring to Dyer as "the shooter" did not conflict with Dyer's defense and was not prejudicial. Likewise, counsel's opening statement commenting on feeling badly for Newby because she had been charged even

---

[2] Each of the defendants separately signed an identical written waiver of conflict form, which was then filed in each of their separate case files. We note that Dyer signed the waiver form that listed Newby's name in the case caption and, therefore, his signature appears in her case file. Similarly, Newby signed the waiver form that listed Dyer's name in the case caption and, therefore, her signature appears in Dyer's case file. Because each of the defendants did in fact waive and sign the documents in open court on the record, the fact that the signatures appear in the wrong case file is immaterial and does not detract from their knowing, intelligent, and voluntary waivers.

though she had not been the shooter was not a conflict if considered in light of counsel's theory of the case. Newby was charged with complicity to commit attempted murder and felonious assault. Newby's defense at trial was to show that she had not been complicit and that Dyer had shot J.W. in self-defense, which would have absolved her of guilt on the charges. Dyer testified that J.W. was the initial aggressor, that he and Newby had not discussed shooting J.W. or causing him any harm, and that Newby had not aided or abetted Dyer in shooting J.W. The fact that the jury found Newby and Dyer guilty did not mean that there was an actual conflict or that defense counsel rendered ineffective assistance. Instead, the jury declined to find that self-defense applied, and it was within its authority to do so.

{¶ 45} Moreover, Dyer and Newby's defenses relied on Dyer's having acted in self-defense and were, therefore, compatible. Their defenses did not result in one assigning blame to the other, and they had a common interest in attacking the credibility of the State's witnesses. Further, Dyer has not set forth any other plausible and viable defense strategy or tactic that might have been pursued but was not undertaken due to the attorney's alleged conflicting loyalties or interests. On this record, we find no actual conflict of interest that adversely affected defense counsel's performance and no violation of Dyer's right to conflict-free representation.

{¶ 46} Dyer also contends that his trial counsel was ineffective for failing to request that his case be severed and tried separately from Newby's. Specifically, Dyer claims that his testimony that Newby was not scared of J.W. weakened his self-defense claim. According to Dyer, if Newby had been tried separately, she presumably would have

testified at Dyer's trial that she had been scared of J.W., which would have helped his self-defense claim.

{¶ 47} Dyer and Newby were jointly indicted for the same offenses in accordance with Crim.R. 8(B). Where co-defendants are jointly indicted for a felony, except in capital offenses, the defendants will be tried together unless "for good cause shown" the trial court severs them. R.C. 2945.13. The law favors joinder of defendants because a single trial "conserves judicial and prosecutorial time, lessens the not inconsiderable expenses of multiple trials, diminishes inconvenience to witnesses, and minimizes the possibility of incongruous results in successive trials before different juries." *State v. Thomas*, 61 Ohio St.2d 223, 225 (1980). However, the preference for joint trials is not absolute. Crim.R. 14 permits a defendant to sever his case from a co-defendant's case if joinder will result in prejudice. In pertinent part, Crim.R. 14 provides that:

If it appears that a defendant or the state is prejudiced by a joinder of . . . defendants in an indictment . . . or by such joinder for trial together of indictments . . . the court shall . . . grant a severance of defendants, or provide such other relief as justice requires.

"A defendant requesting severance 'has the burden of furnishing the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial.'" *State v. Koch*, 2019-Ohio-4099, ¶ 69 (2d Dist.), quoting *State v. Torres*, 66 Ohio St.2d 340, 343 (1981).

{¶ 48} Dyer has not established that there was a reasonable probability that a motion to sever would have been granted if his counsel had filed one or that the verdict

would have been different. Even if counsel had filed a motion to sever the trials, it is highly unlikely that the trial court would have granted the motion, considering that the charges involved Dyer and Newby acting in concert and they were charged in a single indictment. Much of the same evidence and exhibits, including the surveillance videos and witnesses, would have been introduced whether the co-defendants were tried together or separately. There were no pretrial statements made by either Dyer or Newby implicating the other, and their defenses were not antagonistic to each other. Judicial economy would not have been served by trying the defendants separately.

{¶ 49} There also is not a reasonable likelihood that the verdicts would have been different had the trials been severed. Dyer's argument is speculative and presupposes that, had their cases been severed, Newby would have waived her Fifth Amendment right not to testify and would have testified at Dyer's trial that she had been scared of J.W. *See, e.g., State v. McCrary*, 2010-Ohio-2011, ¶ 24 (2d Dist.). Notably, such testimony would have contradicted Dyer's testimony that Newby had not feared J.W. Having Newby testify in a way that contradicted Dyer's testimony on this or any other fact may have caused the jury to find Dyer even less credible. Accordingly, we conclude that Dyer's allegation that trial counsel was ineffective for failing to file a motion to sever his trial from his co-defendant's is without merit.

### B. Trial Strategy

{¶ 50} Dyer also submits that trial counsel's strategy was inconsistent throughout the trial and prejudiced Dyer's defense. Dyer takes issue with defense counsel's opening statement and closing argument, his questioning of witnesses, and his emphasis

on the importance of the surveillance videos. We do not agree with Dyer's view of counsel's performance and cannot conclude that the result of the trial would have been different.

{¶ 51} "The object of an ineffectiveness claim is not to grade counsel's performance." *Strickland*, 466 U.S. at 697. Rather, an ineffectiveness claim "is an attack on the fundamental fairness of the proceeding whose result is challenged." *Id.* Thus, even if counsel's performance has fallen below an objective standard of reasonable representation, a defendant must demonstrate that actual prejudice arose as a result of counsel's performance. *Bradley*, 42 Ohio St.3d 136, at paragraph two of the syllabus. "[A] court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland* at 695.

{¶ 52} Dyer filed a notice of intent to claim self-defense prior to trial. This was the defense upon which he relied during the course of the trial and was the basis of defense counsel's questions to the witnesses. Although perhaps not always artful, defense counsel clearly attempted to elicit testimony in favor of Dyer's self-defense argument and, in some instances, was able to gain favorable testimony on cross-examination. Counsel's trial strategy of self-defense never varied. Although unsuccessful, counsel developed a coherent and consistent defense theory that was presented to the jury.

{¶ 53} Dyer also now argues that counsel's reliance on the surveillance videos changed during trial, which caused him prejudice. We do not agree. Two surveillance videos were submitted in this case: one from McDonald's and one from Speedway. Both videos were from a significant distance away from the shooting, portrayed different

angles, and were subject to some interpretation. Whereas the State submitted the videos to support the testimony of the State's witnesses, Dyer's counsel used the videos to challenge the veracity and credibility of the State's witnesses and to support Dyer's version of events. It was not unreasonable for counsel to rely on the videos and argue the defense's interpretation of them, even if some of the State's witnesses disagreed. Defense counsel did not indicate in closing argument that the jury should not rely on the videos, as he previously had suggested in his opening statements; rather, he encouraged the jury to review the videos during deliberations and pointed to evidence at the trial that supported Dyer's version of events being consistent with the videos. But even if defense counsel did change tactics during trial, a midtrial change in strategy based on the evidence presented does not constitute deficient performance. *State v. Cepec*, 2016-Ohio-8076, ¶ 111, citing *State v. Mundt*, 2007-Ohio-4836, ¶ 134. We cannot conclude on this record that defense counsel lacked a strategy or that Dyer was prejudiced as a result of counsel's performance.

### C. Trial Counsel's Unprofessional Conduct

{¶ 54} Finally, Dyer asserts that defense counsel's multiple improper comments and unprofessional conduct prejudiced him and denied him a fair trial. In support of this argument, Dyer raises several specific instances of alleged ineffective assistance of counsel. We will consider each instance cited by Dyer.

#### 1. Burden of Proof

{¶ 55} Dyer first alleges that defense counsel improperly shifted the burden of proof to Dyer during voir dire in explaining self-defense when he stated, "I get to prove

stuff to you today." Trial Tr. 58. Prior to this statement, defense counsel had indicated to the jury that the case involved a self-defense claim. Around the same time, counsel declared his excitement about being at trial and asked if any jurors also wanted to be there. This comment was made not while discussing the burden of proof as it related to self-defense but rather while expressing enthusiasm about being at trial. Viewing the voir dire as a whole, we do not agree that counsel's isolated statement implied a shift in the burden of proof to Dyer or that it affected the outcome of trial. The jury was instructed by the trial court of the correct burdens of proof, and the jury is presumed to have followed the trial court's instructions. *See State v. Stallings*, 89 Ohio St.3d 280, 286 (2000).

### 2. Statements for Sympathy

**{¶ 56}** Dyer next argues that counsel made an improper comment during his opening statement contrasting Newby's culpability to Dyer's, thus prejudicing him. At the conclusion of defense counsel's opening statement, he made the following comments:

Ladies and gentlemen, this case is nothing but a self-defense. *You're gonna feel bad for Ms. Newby because this poor girl is being charged for a crime which she's not even the shooter.* Her crime is what, not rolling over to a grown man. Her crime is talking back to a man. Her crime has nothing to do with attempted murder. It is called unlawful. It's called injustice.

(Emphasis added.) Trial Tr. 158.

**{¶ 57}** We do not agree that the highlighted statement was prejudicial to Dyer; it was tailored to defense counsel's theory of the case, which he had laid out for the jury

immediately prior to making the above statements. This included alleging that J.W. had been the instigator, that J.W. had threatened Newby and Dyer, and that J.W. had then aggressively charged at Dyer and Newby, causing Dyer to shoot J.W. in self-defense. It also corresponded with the defense theory of the case that Newby and Dyer did not collaborate in attacking J.W. and that neither of them had had any preconceived plans to shoot J.W. with the intent to kill him. Furthermore, because Dyer was arguing self-defense, there was no "concession of guilt" by admitting that Dyer was the shooter, and this admission was not incompatible with Dyer's defense. When examined within the context of the entire record of the trial proceedings, we conclude that the statements made by Dyer's defense counsel demonstrated neither deficiency nor prejudice.

### 3. Insulting the Jury

{¶ 58} Dyer next claims that defense counsel insulted the jury during closing argument when he stated that he does not "trust juries," which resulted in prejudice to Dyer. "Counsel for both sides are afforded wide latitude during closing arguments." *State v. Lang*, 2011-Ohio-4215, ¶ 192, citing *State v. Brown*, 38 Ohio St.3d 305, 317 (1988). A reviewing court "must assess the reasonableness of the attorney's decisions at the time they are made, not at the time of our assessment." *State v. Wilkins*, 64 Ohio St.2d 382, 390 (1980). "Debatable trial tactics generally do not constitute a deprivation of effective counsel." *Lang* at ¶ 192, citing *State v. Phillips*, 74 Ohio St.3d 72, 85 (1995).

{¶ 59} Having reviewed the context of counsel's statement, we do not conclude that this statement was deficient or prejudicial. Counsel was explaining why Dyer left the Speedway immediately after the shooting and why he did not turn himself in thereafter.

Essentially, defense counsel argued that Dyer behaved as he did because he was afraid to be judged by a jury, which may or may not have believed him, even though he felt he did nothing wrong by acting in self-defense. Defense counsel's argument was made to counteract the jury instruction on consciousness of guilt and was reasonable in light of the evidence at trial. Because counsel's decision to make this argument was a tactical decision, it did not rise to the level of ineffective assistance.

### 4.    Admonishments by the Court

{¶ 60} Dyer asserts that the numerous times that the trial court sustained objections or admonished defense counsel in front of the jury resulted in prejudice to him. Having thoroughly reviewed the record, including the specific instances Dyer raises, we cannot conclude that counsel was ineffective. The majority of the instances cited by Dyer occurred during cross-examination of the State's witnesses. "The scope of cross-examination falls within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel." *State v. Conway*, 2006-Ohio-2815, ¶ 101. Even unsuccessful tactical or strategic decisions will not necessarily constitute ineffective assistance of counsel. *State v. Carter*, 72 Ohio St.3d 545, 558 (1995). Defense counsel acted zealously to obtain concessions from State's witnesses and attack their credibility. The fact that objections were sustained or that the trial court instructed counsel on various occasions throughout trial did not constitute deficient performance. "Attorneys are subject to errors in judgment and reasoning, particularly in the heat of trial." *State v. Malone*, 1989 WL 150798, *5 (2d Dist. Dec. 13, 1989). But the errors do not rise

to the level of ineffective assistance unless counsel's actions "seriously eroded the very integrity of the trial." *Id.* While at times defense counsel's comments were improper, we cannot say that they were so prejudicial as to deny Dyer a fair trial. Moreover, the court instructed the jury to disregard defense counsel's editorializing comments, and "[c]urative instructions are generally viewed as sufficient to remedy the risk of undue prejudice." (Citations omitted.) *State v. Gray*, 2020-Ohio-1402, ¶ 48 (2d Dist.). The court also instructed the jury that evidence does not include the statements or arguments of counsel, instructions the jury presumably followed. *State v. Neyland*, 2014-Ohio-1914, ¶ 191.

{¶ 61} Dyer also points to statements made by defense counsel during closing argument. Defense counsel argued that the State had an agenda in this case to convict Dyer and Newby at all costs, regardless of the evidence. In support of his argument, defense counsel made an isolated statement during closing argument regarding Governor DeWine's shutting down the state during the COVID pandemic in an effort to show how the State has the power to do whatever it wants. Though not particularly helpful, the statement was directed toward defense counsel's theory of the case, it was brief, an objection was made, and defense counsel immediately moved on. Closing arguments of counsel fall within the realm of trial strategy, which we will not second guess. *State v. Cameron*, 2009-Ohio-6479, ¶ 31 (10th Dist.). Accordingly, we cannot conclude that defense counsel's statements in closing argument were deficient or prejudicial.

{¶ 62} Dyer has not shown that trial counsel's conduct fell below an objective standard of reasonableness, and we cannot conclude that the outcome of the trial would

have been different even if counsel's performance had been deficient. The alleged failures of Dyer's trial counsel did not deprive him of a fair trial, and there was ample evidence to support the jury's determination of Dyer's guilt.

{¶ 63} Dyer's first assignment of error is overruled.

### III. Second Assignment of Error

{¶ 64} Dyer's second assignment of error is:

TRIAL COURT ABUSED ITS DISCRETION AND PREJUDICED DYER BY ACCEPTING THE WAIVER OF CONFLICT AND FAILING TO REASEAONABLY [SIC] PERCEIVE THE CONFLICT WOULD ARISE AND PREJUDICE DYER AS IT DID IN THE UNDERLYING CASE.

{¶ 65} In his second assignment, Dyer alleges that the trial court abused its discretion by accepting his waiver of a conflict of interest, which resulted in prejudice to him at trial. Dyer concedes in his reply brief that the waiver of conflict was read on the record and signed in open court on the morning the jury trial commenced. However, he argues that it is unclear whether the waiver was "a meaningful, thoughtful, thoroughly explained waiver of any conflict of interest," and that counsel's performance at trial demonstrated that counsel was ineffective and that the trial court should not have accepted the waiver. Appellant's Reply Brief, p. 6.

{¶ 66} A trial court has discretion to refuse to accept a waiver of conflict of interest. *State v. Keenan*, 81 Ohio St.3d 133, 137 (1998). Thus, a trial court's decision to accept or reject a waiver of conflict of interest is reviewed for an abuse of discretion. An "abuse of discretion" implies that a court's attitude is unreasonable, arbitrary, or unconscionable.

*State v. Adams*, 62 Ohio St.2d 151, 157 (1980). "A decision is unreasonable if there is no sound reasoning process that would support that decision." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990). "It is not enough that the reviewing court, were it deciding the issue de novo, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result." *Id.*

{¶ 67} The record reflects that Dyer was informed about the possible conflict, was represented by legal counsel of his own choice, understood the terms of the waiver, and signed the written waiver of conflict after the court recited the waiver on the record. Both Dyer and Newby were present in court at the time of the waivers, waived any conflict in writing, and advised the court that they intended to proceed with counsel's joint representation. Neither Dyer nor Newby objected or expressed reservations about the dual representation, and they both explicitly waived any conflict of interest in their attorney's dual representation prior to trial. Defense counsel was in the best position to know whether a potential conflict existed, and he denied there was a conflict during the scheduling hearing.

{¶ 68} Moreover, Dyer cannot establish that he was prejudiced by the trial court's acceptance of his waiver because there was no conflict of interest. Dyer was able to testify about his use of self-defense, which was beneficial to both defendants. Likewise, Dyer's testimony attempted to establish that Newby was not complicit and placed the blame on J.W. for instigating the situation that resulted in the shooting. The defense theories were not antagonistic, and there was no evidence that was introduced for only

one defendant but not the other or that tended to exculpate one defendant but not the other. The defendants shared a common interest in attacking the credibility of the State's witnesses and the evidence. We cannot conclude on this record that the trial court abused its discretion in accepting Dyer's waiver of conflict.

{¶ 69} Dyer's second assignment of error is overruled.

## IV. Third Assignment of Error

{¶ 70} In his third assignment of error, Dyer alleges the following:

THE TRIAL COURT ABUSED ITS DISCRETION BY EXCLUDING EVIDENCE OF THE VICTIM'S FACEBOOK POST AND PRIOR RECORD.

{¶ 71} Dyer contends that the trial court was unreasonable in refusing to admit J.W.'s traffic record and a Facebook video J.W. made discussing the shooting. He claims that he should have been able to admit J.W.'s "horrible driving record" and that the State opened the door to J.W.'s speeding record. Dyer further argues that the admission of J.W.'s Facebook video and his driving record were relevant to show "his dangerousness and provocation." Appellant's Brief, p. 32.

### A. Speeding Record

{¶ 72} "A trial court has broad discretion to admit or exclude evidence, and its exercise of that discretion will not be disturbed on appeal absent an abuse of discretion." *State v. Easterling*, 2019-Ohio-2470, ¶ 54 (2d Dist.), citing *State v. Norris*, 2015-Ohio-624, ¶ 14 (2d Dist.). Generally, relevant evidence is admissible whereas evidence that is not relevant is not admissible. Evid.R. 402. To be relevant, evidence must have a "tendency to make the existence of any fact that is of consequence to the determination

of the action more or less probable than it would be without the evidence." Evid.R. 401. "In other words, there must be some probative value to the evidence." *State v. Sutherland*, 2021-Ohio-2433, ¶ 24 (2d Dist.).

**{¶ 73}** During cross-examination of J.W., defense counsel asked if it was true that J.W. had "about seven speeding tickets." The State objected to the question, and the trial court sustained the objection. Defense counsel then asked J.W. if he had a bad driving record. The trial court again declined to allow J.W. to answer and instructed trial counsel to move on. Trial Tr. 380. Counsel did not explain why J.W.'s driving record would be relevant or proffer what the driving record was. Nevertheless, on appeal, Dyer claims it was relevant to show J.W.'s "dangerousness and provocation" and to "impeach [J.W.'s] victim status." Appellant's Brief, p. 32.

**{¶ 74}** The trial court refused to allow Dyer's questions about J.W.'s speeding record, concluding that the evidence was not relevant. We agree with the trial court. J.W. admitted that he had been speeding before he arrived at the Speedway gas station and that he regularly drove "pretty fast." But whether J.W. drove fast on prior occasions was not an issue in dispute and had no bearing on whether Dyer had committed attempted murder or felonious assault or whether he had acted in self-defense. Furthermore, because J.W. had already admitted he was a fast driver and was speeding before he arrived at Speedway on the day in question, no relevant fact would have been established by introducing evidence that J.W. had received speeding tickets in the past. Rather, such evidence would have been cumulative, at best. Under these facts, we cannot conclude that the trial court abused its discretion in rejecting Dyer's attempt to

admit J.W.'s speeding record.

### B.     Facebook Video

{¶ 75} During cross-examination, J.W. admitted that he posted a video on Facebook while he was in the hospital that discussed the shooting.   When J.W. denied making a certain alleged statement in the Facebook video, defense counsel suggested excusing the jury so that counsel could play the video for J.W. in an attempt to refresh his memory; then, if J.W.'s memory was not refreshed, counsel would seek to impeach him with the video.   The court excused the jury so defense counsel could refresh J.W.'s memory with his prior statements in the Facebook video.   Defense counsel played several sections from the video for J.W., during which the court advised defense counsel, "I didn't hear anything that was asked that he didn't admit to."   Trial Tr. 396.   After playing the relevant portions of the video, defense counsel advised the court that he did not plan to admit the video as an exhibit but "was just using it as I would a police report or a body cam video."   *Id.* at 398.

{¶ 76} At the conclusion of Dyer's presentation of evidence, defense counsel stated that he did not intend to introduce the Facebook video as an exhibit "but to give it to the court as a record.   So I'll call it Exhibit B, but I'm not going to introduce it."   *Id.* at 514.   (The Facebook video was later identified as Defense Exhibit D due to other defense exhibits."   From counsel's statements, it was clear that the Facebook video was "being admitted simply for purposes of the record."   *Id.* at 516.   Given that defense counsel stated that he did not intend to admit the Facebook video into evidence and never asked for it to be admitted as evidence, Dyer's argument that the court erred in failing to admit

it is contradicted by the record. The trial court could not have abused its discretion in failing to admit evidence when Dyer never requested its admission at trial.

{¶ 77} Dyer's third assignment of error is overruled.

### V. Fourth Assignment of Error

{¶ 78} Dyer's fourth assignment of error states:

THE TRIAL COURT ABUSED ITS DISCRETION BY REFUSING TO INSTRUCT THE JURY ON LESS[E]R AND INFERIOR OFFENSES, ALL OF WHICH PREJUDICED APPELLANT'S RIGHT TO A FAIR TRIAL PURSUANT TO THE FIFTH AND SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION.

{¶ 79} Dyer challenges the trial court's refusal to give a jury instruction on the inferior-degree offense of aggravated assault. According to Dyer, there was sufficient evidence presented at trial to establish the mitigating element of serious provocation such that a jury instruction for aggravated assault was appropriate. We disagree.

{¶ 80} "The rule regarding jury instructions is that requested instructions in a criminal case must be given when they are correct, pertinent, and timely presented." *State v. Joy*, 74 Ohio St.3d 178, 181 (1995), citing *Cincinnati v. Epperson*, 20 Ohio St.2d 59 (1969), paragraph one of the syllabus. However, "a trial court need not instruct the jury on an issue for which there is no supporting evidence." *State v. Wendling*, 2022-Ohio-496, ¶ 29 (2d Dist.), citing *State v. Rahe*, 2007-Ohio-5864, ¶ 17 (10th Dist.).

{¶ 81} "When the indictment or information charges an offense, including different degrees, or if other offenses are included within the offense charged, the jury may find

the defendant not guilty of the degree charged but guilty of an inferior degree thereof or lesser included offense." R.C. 2945.74; *see also* Crim.R. 31(C). Thus, "a jury may consider, in addition to the offense actually indicted, inferior degrees of the indicted offense." *State v. Beatty-Jones*, 2011-Ohio-3719, ¶ 20 (2d Dist.), citing *State v. Deem*, 40 Ohio St.3d 205 (1988), paragraph one of the syllabus. However, "a judge is to give instructions on lesser-included and inferior-degree offenses only when the evidence would allow a jury to reasonably reject the greater offense and find the defendant guilty on the lesser-included or inferior-degree offenses." (Citations omitted.) *State v. Lloyd*, 2022-Ohio-4259, ¶ 26. In deciding whether to give an instruction on an inferior degree offense, the trial court must evaluate the evidence "in the light most favorable to the defendant, without weighing the persuasiveness of the evidence." *State v. Shane*, 63 Ohio St.3d 630, 637 (1992), citing *Wilkins*, 64 Ohio St.2d at 388.

{¶ 82} "A trial court has broad discretion to decide how to fashion jury instructions, but it must 'fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder.' " *State v. White*, 2015-Ohio-492, ¶ 46, quoting *State v. Comen*, 50 Ohio St.3d 206 (1990), paragraph two of the syllabus. "An appellate court reviews a trial court's refusal to give a requested jury instruction for abuse of discretion." *State v. Adams*, 2015-Ohio-3954, ¶ 240, citing *State v. Wolons*, 44 Ohio St.3d 64, 68 (1989).

{¶ 83} Dyer was charged with felonious assault and requested a jury instruction on aggravated assault after the close of evidence. Aggravated assault requires proof beyond a reasonable doubt that a defendant committed the offense "while under the

influence of sudden passion or in a sudden fit of rage, either of which [was] brought on by serious provocation occasioned by the victim that [was] reasonably sufficient to incite the person into using deadly force . . ." R.C. 2903.12(A). "Aggravated assault is an inferior degree offense of felonious assault which means that aggravated assault has the same elements as felonious assault but there is the additional mitigating element of serious provocation." (Citations omitted.) *State v. Laraby*, 2018-Ohio-113, ¶ 19 (2d Dist.). Where a defendant is charged with felonious assault and presents sufficient evidence of serious provocation at trial, an instruction on aggravated assault must be given to the jury. *Deem* at paragraph four of the syllabus.

{¶ 84} Whether the trial court should have provided an aggravated assault instruction in this case depends on whether, based on the evidence presented, the jury could have reasonably found Dyer not guilty of felonious assault but found him guilty of aggravated assault. Thus, the question is whether there was sufficient evidence presented at trial that Dyer knowingly shot J.W. while under the influence of sudden passion or in a sudden fit of rage brought on by serious provocation occasioned by J.W. so as to warrant a jury instruction for aggravated assault.

{¶ 85} "Provocation, to be serious, must be reasonably sufficient to bring on extreme stress and the provocation must be reasonably sufficient to incite or to arouse the defendant into using deadly force." *Id.* at paragraph five of the syllabus. "In determining whether the provocation was reasonably sufficient to incite the defendant into using deadly force, the court must consider the emotional and mental state of the defendant and the conditions and circumstances that surrounded him at the time." *Id.*

"In the context of aggravated assault, the evaluation of whether provocation is reasonably sufficient to constitute serious provocation is a two-part analysis." *Koch*, 2019-Ohio-4099, at ¶ 91, citing *State v. Mack,* 82 Ohio St.3d 198, 201 (1998). First, "an objective standard must be applied to determine whether the alleged provocation is reasonably sufficient to bring on a sudden passion or fit of rage." *Mack* at 201. The provocation must be "sufficient to arouse the passions of an ordinary person beyond the power of his or her control." *Shane*, 63 Ohio St.3d at 635. If the objective standard is satisfied, the inquiry becomes a subjective one to determine whether the defendant in a particular case "actually was under the influence of sudden passion or in a sudden fit or rage." *Mack* at 201, citing *Shane* at 634-635. "Classic examples of serious provocation are assault and battery, mutual combat, illegal arrest and discovering a spouse in the act of adultery." *State v. Thornton*, 2005-Ohio-3744, ¶ 50 (2d Dist.), citing *Shane* at 635.

{¶ 86} Dyer also requested, and was granted, instructions on self-defense. "This court has recognized that a self-defense argument generally is inconsistent with a serious-provocation theory." *State v. Miller*, 2022-Ohio-213, ¶ 17 (2d Dist.), citing *State v. Brown*, 2018-Ohio-3068, ¶ 47 (2d Dist.). Accordingly, "self-defense and aggravated-assault . . . instructions are incompatible in most cases." *Id.* "Nevertheless, we recognized in *Brown* that the two theories conceivably might be compatible where a defendant is found to have exceeded the degree of force necessary to defend himself because he acted out of passion or rage." *Id.*

{¶ 87} The trial court denied Dyer's requested jury instruction for aggravated assault, concluding that there was no evidence presented at trial to support the instruction

and, further, that Dyer's self-defense claim was incompatible with his aggravated assault claim. On this record, viewing the evidence in the light most favorable to Dyer, we find the evidence insufficient, as a matter of law, to establish provocation that was reasonably sufficient to incite the use of deadly force. Accordingly, the trial court did not abuse its discretion in refusing to instruct the jury on aggravated assault.

{¶ 88} There was no testimony presented to support the argument that Dyer objectively acted under the influence of a sudden passion or fit of rage at the time of the shooting. J.W. and Dyer were strangers and had no prior connection before the day of the shooting. Several witnesses testified that Dyer was trying to de-escalate the situation between Newby and J.W. and that the verbal arguments were primarily between Newby and J.W., not Dyer. Notably, "words alone will not constitute reasonably sufficient provocation to incite the use of deadly force in most situations." *Mack*, 82 Ohio St.3d at 201, citing *Shane*, 63 Ohio St.3d 630, at paragraph two of the syllabus. Further, there was no testimony from any witness that there was a physical confrontation between J.W. and Dyer or that Dyer appeared angry. At best, Gibson and Miller testified that J.W. "flinched" at Newby, but Gibson further testified that the movement was not aggressive. This purported movement of J.W. toward Newby was insufficient provocation to incite Dyer into using deadly force. Nor did Dyer's version of events objectively put forth sufficient evidence of provocation occasioned by J.W. Dyer claimed that the only verbal threat made by J.W. -- that J.W. "had something for [Dyer]" -- occurred while J.W. was sitting in his truck before moving the truck toward the exit. Likewise, the only other conflict between J.W. and Dyer prior to the shooting was J.W.'s "sprinting" at Dyer. This

characterization did not meet the standard for serious provocation, as even a violent charge towards a defendant does not constitute sufficient provocation to warrant an aggravated assault instruction. *State v. Shepherd*, 2017-Ohio-328, ¶ 31 (12th Dist.).

**{¶ 89}** Moreover, accepting Dyer's testimony as true that J.W. charged at him, Dyer never testified that he acted in a sudden passion or fit of rage at the time of the shooting to meet the subjective standard for an aggravated assault instruction. Rather, Dyer testified that he was "scared" and "in fear for his life" at the time he fired his gun and only wanted "to scare [J.W.] away." Dyer's alleged fear of J.W. was insufficient to warrant an aggravated assault instruction. "Fear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage." *Mack* at 201. Absent evidence that Dyer acted under the influence of sudden passion or in a fit of rage caused by serious provocation from J.W., the trial court did not abuse its discretion in refusing to instruct the jury on aggravated assault.

**{¶ 90}** Dyer's reliance upon Detective DeWine's testimony to support an aggravated assault instruction is misplaced. On cross-examination, the following exchange occurred:

[Defense counsel]: Okay. But you did have a police report, and I can give it to you, but I think you're a smart guy with good memory because you looked at your whole file. Do you have an indication or representation in there that this is a case that involves road rage and aggravated assault, correct? Do you remember those terms, 'road rage' and 'aggravated assault?'

[Detective DeWine]: Yes, I believe that those words were used in a couple incidents, yes.

[Defense counsel]: Okay. Why are they charged with attempted murder then instead of aggravated assault?

[Detective DeWine]: Severity of the injury.

[Defense counsel]: Isn't – wouldn't you agree, from your experience, that where you see aggravated assault is maybe where somebody uses self-defense and maybe it wasn't appropriate, but I could see why they're provoked? So in other words, when you look at this case, let's just assume, for example, everything that we've heard is true, right? Jeff shoots the guy. But it's also true and undisputed that this guy is recklessly pursuing these individuals, right? He comes after them. We can agree on that, right?

[Detective DeWine]: He pulled into the lot after they were already on the lot, sure.

Trial Tr. 453.

{¶ 91} The fact that the words "aggravated assault" may have been mentioned in a police report does not constitute evidence that Dyer shot J.W. while under the influence of a sudden passion or in a sudden fit of rage brought on by serious provocation by J.W. that was reasonably sufficient to incite Dyer into using deadly force. As previously stated, Dyer never testified that he had been angry or provoked by J.W., only that he was scared. Nor was there any testimony that Dyer objectively appeared to shoot J.W. as a

result of being under the influence of sudden passion or in a sudden fit of rage. Because the evidence failed to demonstrate the existence of serious provocation, an instruction on aggravated assault was not warranted, and the trial court did not abuse its discretion in refusing to give that instruction.

{¶ 92} Dyer's fourth assignment of error is overruled.

### VI. Fifth Assignment of Error

{¶ 93} In his final assignment of error, Dyer claims the following:

APPELLANT'S CONVICTIONS FOR ATTEMPTED MURDER AND FELONIOUS ASSAULT WITH THE GUN SPECIFICATIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE BECAUSE EVIDENCE INDICATES THAT APPELLANT ACTED IN SELF-DEFENSE.

{¶ 94} Dyer was found guilty of attempted murder and felonious assault. R.C. 2903.02(A) proscribes the offense of murder: "No person shall purposely cause the death of another . . ." R.C. 2923.02(A) defines attempt, which states: "No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense." A person acts with "purpose" when he or she has the "specific intention to cause a certain result, or . . . to engage in conduct of [a certain] nature." R.C. 2901.22(A). R.C. 2903.11(A)(2) proscribes felonious assault, which provides: "[n]o person shall knowingly . . . (2) Cause or attempt to cause physical harm to another . . . by means of a deadly weapon or dangerous ordnance."

{¶ 95} At trial, Dyer argued that he committed the offenses while acting in self-

defense. In Ohio, a person is allowed to act in self-defense. R.C. 2901.05(B)(1). The elements of a self-defense claim involving the use of deadly force are: " '(1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he [or she] was in imminent danger of death or great bodily harm and that his [or her] only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger.' " *State v. Messenger*, 2022-Ohio-4562, ¶ 14, quoting *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002). "[T]the second element of self-defense is a combined subjective and objective test." *State v. Thomas*, 77 Ohio St.3d 323, 330 (1997). With regard to the third element, "[f]ollowing a recent amendment to R.C. 2901.09(B), 'a person has no duty to retreat before using force in self-defense * * * if that person is in a place in which the person lawfully has a right to be.' " *State v. Palmer*, 2024-Ohio-539, ¶ 23, citing R.C. 2901.09(B) and 2020 Am.S.B. No. 175.

**{¶ 96}** Self-defense is an affirmative defense, and the burden of production is on the defendant. *Messenger* at ¶ 21, citing R.C. 2901.05(A). "Once the defendant puts forth sufficient evidence that he or she was acting in self-defense, the burden then shifts to the State to prove that the defendant did not act in self-defense." (Citations omitted.) *State v. Bierma*, 2024-Ohio-2089, ¶ 68 (2d Dist.). "To accomplish this, the State must disprove beyond a reasonable doubt at least one of the elements of self-defense." *State v. Bowen*, 2024-Ohio-1079, ¶ 12 (2d Dist.), citing *State v. Gutierrez-Reynoso*, 2023-Ohio-3122, ¶ 72 (11th Dist.). "The state's new burden of disproving the defendant's self-defense claim beyond a reasonable doubt is subject to a manifest-weight review on

appeal . . ."  *Messenger* at ¶ 27.

{¶ 97} "A reviewing court considering a manifest-weight claim 'review[s] the entire record, weighs the evidence and all reasonable inferences, [and] considers the credibility of witnesses.' "  *State v. Group*, 2002-Ohio-7247, ¶ 77, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).   "The question for the reviewing court is 'whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.   The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against conviction.' "  *Id.*, quoting *Martin* at 175, and citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

{¶ 98} The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of fact to resolve.   *State v. Tucker*, 2018-Ohio-2859, ¶ 23 (2d Dist.), citing *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967).   "Because the factfinder . . . has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility."  *State v. Lawson*, 1997 WL 476684, *4 (2d Dist. Aug. 22, 1997).   "The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness."  *Id.*   "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence."  *State v. Smith*, 2019-Ohio-2467, ¶ 20 (2d Dist.), citing *State v. Wilson*, 2009-Ohio-525, ¶ 14 (2d Dist.).

"This court will not substitute its judgment for that of the trier of fact on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict." *State v. Segovia*, 2024-Ohio-1392, ¶ 36 (2d Dist.), citing *State v. Bradley*, 1997 WL 691510, *4 (2d Dist. Oct. 24, 1997).

{¶ 99} Dyer argues his conviction was against the manifest weight of the evidence because he met his burden of establishing self-defense. There is no dispute that Dyer did not have a duty to retreat in this case. There is also no dispute that Dyer caused physical harm to J.W. by means of a deadly weapon, i.e., a handgun, thereby using deadly force. *See State v. Dale*, 2013-Ohio-2229, ¶ 15 (2d Dist.) ("The use of a gun constitutes the use of deadly force."); R.C. 2901.01(A)(2) (defining "[d]eadly force" as "any force that carries a substantial risk that it will proximately result in the death of any person"). According to Dyer, "he was not the initial aggressor, he attempted to diffuse the situation, and he only responded with deadly force after [J.W.] followed him and Newby to the gas station, after [J.W.] was verbally aggressive, and after [J.W.] got out of his truck, approached Newby and Dyer, and made an aggressive action towards Newby." Appellant's Brief, p. 37.

{¶ 100} The evidence at trial established that Newby and Dyer were in a relationship at the time of the shooting, and he was a passenger in her vehicle when the incident began. J.W. pulled into the gas station after Newby and Dyer had already pulled in and had a verbal altercation with Newby from inside his truck. All the witnesses observed Newby aggressively arguing with J.W., either when he pulled into the gas station or when he stopped his truck near the exit. However, several witnesses,

including J.W. and Dyer, indicated that Dyer was not participating in the verbal altercation.

{¶ 101} Anderson and Miller heard a female voice, undoubtedly Newby, say she was going to shoot someone during the argument. J.W. testified that Newby had threatened to kill him, which is why he stopped his truck and got out. Dyer, on the other hand, claimed Newby only called J.W. "the B word." After J.W. stepped out of his truck and walked to the back of it, Newby and Dyer both moved toward him. Although Dyer denied that he approached J.W.'s truck and claimed to have stayed by the gas pump nearly the whole time, including when he shot J.W., none of the witnesses corroborated his statement. Rather, the other witnesses testified that Dyer was near Newby while she was arguing with J.W. after J.W. got out of his truck. Several witnesses stated that Dyer attempted to prevent Newby from escalating the situation by grabbing her or spinning her around but that Newby would not return to her car. None of the witnesses testified that J.W. had threatened Newby or Dyer. Further, Dyer only alleged that, while J.W. was outside of his truck, J.W. threatened to "get someone to beat [Newby] up," not that J.W. threatened any harm directly to Dyer. Trial Tr. 488. Both Dyer and J.W. testified that Newby spit at J.W.'s face immediately prior to the shooting, but no other physical contact occurred. Gibson testified that J.W. "flinched" at Newby but testified that it was not aggressive. Miller likewise testified that J.W. and Newby flinched at each other but stated that no physical contact occurred and J.W. was turning away from Dyer when he was shot. Although Dyer claimed not to have intended any harm to J.W. when he shot the gun, Dyer agreed at trial that one could infer that when you aim a gun at someone and you pull the trigger, you intend to kill. J.W., who was unarmed, was shot near the

rear of his truck and immediately dropped to the ground. The bullet struck the back left side of J.W.'s neck, paralyzing him from the chest down. According to Dyer, the whole reason he shot J.W. was because J.W. "charged" at him, and he explained that the bullet hit the back left side of J.W.'s neck because J.W. turned his head while running toward Dyer with his hands in the air. Notably, several of the witnesses testified that J.W. was turning around to head back to his truck at the time he was shot, and none of the witnesses testified that J.W. "made a full sprint" at Dyer as Dyer alleged. Furthermore, Dyer admitted that where J.W. fell after he was shot was where he had been standing when Dyer shot him. J.W. was discovered on the ground on his back near the rear driver's side of his truck, and a spent shell casing was recovered to the right of the rear of J.W.'s truck, not near the gas pump from which Dyer alleged he fired the shot. Detective DeWine testified that when a shell casing is ejected from a semi-automatic handgun, it ejects to the right. Therefore, according to Detective DeWine, in this case, the shooter would have been closer to J.W.'s truck at the time of the shooting. Detective DeWine likewise testified that Dyer shot J.W. from a distance "within at least six feet," which would have been inconsistent with Dyer's shooting the gun from the gas pump was about 25 feet away.

{¶ 102} Whether Dyer was at fault in creating the affray or had reasonable grounds to believe and did in fact believe that he was in imminent danger of death or serious physical harm under the facts presented in this case was for the jury to determine. The jury credited the testimony of the State's witnesses over Dyer's, and we defer to their credibility assessment. The jury considered all the evidence and ultimately found the

State's version of events more credible, thereby rejecting Dyer's claim of self-defense. Based on the evidence presented, the jury did not lose its way and create a manifest miscarriage of justice. To the contrary, the evidence strongly supported the jury's rejection of Dyer's self-defense claim and its finding that Dyer attempted to purposely cause the death of J.W. and knowingly caused physical harm to J.W. by means of a deadly weapon. After Dyer shot J.W., he fled from the scene with Newby, did not call the police, and did not turn himself in, further confirming his criminal intent. Dyer's case is not an exceptional one in which the evidence weighed heavily against his conviction.

{¶ 103} Dyer's fifth assignment of error is overruled.

**VII. Conclusion**

{¶ 104} Having overruled all of Dyer's assignments of error, we will affirm the judgment of the trial court.

. . . . . . . . . . . . .

EPLEY, P.J. and TUCKER, J., concur.